465 N.E.2d 1195, 392 Mass. 28, Com. v. Hunt, (Mass. 1984)                                   **Page 1**

**\*1195** 465 N.E.2d 1195

392 Mass. 28

Supreme Judicial Court of Massachusetts,
Hampden.

**COMMONWEALTH**
**v.**
**Kenneth L. HUNT.**
Argued Jan. 11, 1984.
Decided May 21, 1984.

Defendant was convicted in the Superior Court,
Hampden County, Hayer, J., of first-degree murder,
and he appealed. The Supreme Judicial Court,
Abrams, J., held that: (1) defendant's statement to
police that he had never been to victim's apartment was
made after defendant's knowing and intelligent waiver
of his *Miranda* rights; (2) testimony of defendant's girl
friend as to defendant's denial that he had been in
victim's apartment was not prejudicial; and (3) one
juror's knowledge of defendant's prior criminal record
did not require new trial, in light of overwhelming
evidence against defendant.

Judgment and denial of motion for new trial
affirmed.

West Headnotes

[1] Criminal Law ⊝⇒412.1(2)
   110 ----
      110XVII Evidence
         110XVII(M) Declarations
            110k411 Declarations by Accused
               110k412.1 Voluntary Character of
                  Statement
               110k412.1(2) Statements While in
                  Custody; Persons to
                  Whom Made.
In murder prosecution, record supported
determination that defendant was not in custody during
police interrogations at station house, particularly in
light of defendant's own testimony that he was
comfortable during questioning and was not in anyway
frightened, threatened, or pressured.

[2] Criminal Law ⊝⇒412.2(5)
   110 ----
      110XVII Evidence
         110XVII(M) Declarations
            110k411 Declarations by Accused
               110k412.2 Right to Counsel; Caution
               110k412.2(5) Failure to Request Counsel;

Waiver.
In murder prosecution, record supported finding
that defendant's waiver of his *Miranda* rights before
telling police during questioning at police station that
he had never been to victim's apartment was knowing
and intelligent, whether or not questioning was
custodial. U.S.C.A. Const.Amend. 5.

[3] Criminal Law ⊝⇒1036.1(5)
   110 ----
      110XXIV Review
         110XXIV(E) Presentation and Reservation in
            Lower Court of Grounds
            of Review
         110XXIV(E)1 In General
            110k1036 Evidence
               110k1036.1 In General
               110k1036.1(3) Particular Evidence
               110k1036.1(5) Confessions,
                  Declarations, and
                  Admissions.
Where defendant did not object to challenged
testimony during murder prosecution, claim that
testimony as to defendant's statements was result of
witness' inducing defendant at police direction to
become intoxicated and discuss victim's murder was
considered only for purpose of determining whether
failure to exclude testimony created substantial risk of
miscarriage of justice.

[4] Criminal Law ⊝⇒412.2(3)
   110 ----
      110XVII Evidence
         110XVII(M) Declarations
            110k411 Declarations by Accused
               110k412.2 Right to Counsel; Caution
               110k412.2(3) Informing Accused as to His
                  Rights.

[See headnote text below]

[4] Criminal Law ⊝⇒1169.12
   110 ----
      110XXIV Review
         110XXIV(Q) Harmless and Reversible Error
            110k1169 Admission of Evidence
               110k1169.12 Acts, Admissions,
                  Declarations, and
                  Confessions of Accused.
If police officer asked defendant's girl friend to get
defendant drunk and induce him to talk about murder
and gave girl friend ten-dollar bill to purchase liquor,
officer's conduct would exceed bounds of proper
investigation and conviction founded on statements
elicited in that context would necessitate reversal for

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

465 N.E.2d 1195, 392 Mass. 28, Com. v. Hunt, (Mass. 1984)                                    **Page 2**

failure to give *Miranda* warnings. U.S.C.A. Const.Amend. 5.

[5] Criminal Law ☜═1169.12
　110 ----
　　110XXIV Review
　　　110XXIV(Q) Harmless and Reversible Error
　　　110k1169 Admission of Evidence
　　　　110k1169.12　　　Acts,　Admissions, Declarations,　and Confessions of Accused.

In murder prosecution, use of defendant's statements to girl friend denying that he was ever in victim's apartment and indicating his interest in what police knew about murder did not prejudice defendant, given defendant's prior assertions to police that he had not been in victim's apartment and fact that defendant had been questioned by police for ten hours, whether or not defendant's statements were improperly elicited by girl friend, as police agent, without *Miranda* warnings. U.S.C.A. Const.Amend. 5.

[6] Witnesses ☜═98
　410 ----
　　410II Competency
　　　410II(B) Parties and Persons Interested in Event
　　　410k91 Interest of Party or Other Person
　　　410k98 Interest Arising from Particular Obligations or Transactions.

In murder prosecution, promise made by police to defendant's girl friend that if she cooperated they would assist her in efforts to bring her children from their grandparents' house to live with girl friend went to credibility of girl friend's testimony, not to its admissibility.

[7] Criminal Law ☜═1119(5)
　110 ----
　　110XXIV Review
　　　110XXIV(G) Record and Proceedings Not in Record
　　　110XXIV(G)15 Questions Presented for Review
　　　　110k1113 Questions Presented for Review
　　　　110k1119 Conduct of Trial in General
　　110k1119(5) Misconduct of Jury.

In hearing on motion for new trial following defendant's conviction of murder, record supported finding that no extraneous information was communicated among jurors prior to their arrival at unanimous verdict.

[8] Criminal Law ☜═1174(2)

110 ----
　　110XXIV Review
　　　110XXIV(Q) Harmless and Reversible Error
　　　110k1174 Conduct and Deliberations of Jury
　　　110k1174(2) Misconduct of Jurors in General.

Competent evidence that one, rather than some or all jurors, had access to potentially prejudicial information unfiltered by trial process may suffice to invalidate verdict.

[9] Criminal Law ☜═925.5(1)
　110 ----
　　110XXI Motions for New Trial
　　　110k924 Misconduct of or Affecting Jurors
　　　110k925.5 Considering Matters Not in Evidence
　　　110k925.5(1) In General.

(Formerly 110k9251/2(1))

Juror's independent knowledge of defendant's criminal record, when established through testimony of other jurors, is overt factor by which verdict's validity can be objectively assessed.

[10] Criminal Law ☜═957(5)
　110 ----
　　110XXI Motions for New Trial
　　　110k948 Application for New Trial
　　　110k957 Statements, Affidavits, and Testimony of Jurors
　　　110k957(5) Consideration by Jury of Matters Not in Evidence.

In hearing on motion for new trial following conviction of murder, defendant met his burden of demonstrating deliberating juror's exposure to extraneous matter by juror's statement indicating juror's awareness of defendant's prior record, in violation of defendant's right to be tried by 12 impartial and unprejudiced jurors. U.S.C.A. Const.Amend. 5.

[11] Criminal Law ☜═868
　110 ----
　　110XX Trial
　　　110XX(J) Issues Relating to Jury Trial
　　　110k868 Objections and Exceptions.

Generally, preempanelment voir dire of prospective jurors, rather than postverdict *Fidler* hearing, is appropriate forum for investigating extraneous knowledge brought to case by juror.

[12] Criminal Law ☜═923(9)
　110 ----
　　110XXI Motions for New Trial
　　　110k923 Disqualification of Jurors

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

465 N.E.2d 1195, 392 Mass. 28, Com. v. Hunt, (Mass. 1984)

**Page 3**

110k923(9) Necessity of Objections at Trial.

In light of juror's nondisclosure during voir dire of his knowledge of defendant's prior record, defendant could not be deemed to have waived his claim for new trial based on juror's undisclosed preempanelment information.

[13] Criminal Law ⚖══923(2)
   110 ----
      110XXI Motions for New Trial
         110k923 Disqualification of Jurors
         110k923(2) Previous Opinion, Prejudice, or
           Declaration.

New trial is not required on basis of **\*1195** juror's withholding disclosure during voir dire of juror's knowledge of defendant's prior criminal record unless defendant is prejudiced thereby.

[14] Criminal Law ⚖══1174(2)
   110 ----
      110XXIV Review
         110XXIV(Q) Harmless and Reversible Error
         110k1174 Conduct and Deliberations of Jury
         110k1174(2) Misconduct of Jurors in
           General.

Evaluation of prejudicial effect of extraneous information to which juror was exposed requires consideration of matrix of factors, including whether information is so inherently damaging to defendant's case that prejudice must be inferred.

[15] Criminal Law ⚖══923(2)
   110 ----
      110XXI Motions for New Trial
         110k923 Disqualification of Jurors
         110k923(2) Previous Opinion, Prejudice, or
           Declaration.

Juror's knowledge of defendant's prior criminal record does not fall into category of extraneous matter which automatically requires new trial, but judge is free to consider effect of extraneous knowledge in light of strength of evidence against defendant.

[16] Criminal Law ⚖══923(2)
   110 ----
      110XXI Motions for New Trial
         110k923 Disqualification of Jurors
         110k923(2) Previous Opinion, Prejudice, or
           Declaration.

In view of overwhelming evidence against defendant in murder prosecution, juror's undisclosed knowledge of defendant's prior criminal record did not require new trial, as defendant was not prejudiced by extraneous matter.

**\*1196**    John F. Donahue, Springfield, for defendant.

Dianne M. Dillon, Asst. Dist. Atty., for the Commonwealth.

Before HENNESSEY, C.J., and ABRAMS, NOLAN, LYNCH and O'CONNOR, JJ.

[392 Mass. 29] ABRAMS, Justice.

The defendant Kenneth L. Hunt appeals his conviction of murder in the first degree and the denial of his motion for a new trial. On appeal, the defendant claims that statements he made to the police were improperly admitted in evidence, that statements made to the woman he lived with after he **\*1197** drank liquor she purchased with money obtained from a police officer involved in the murder investigation should not have been admitted, and that a new trial is required because one or more of the jurors were exposed to prejudicial information from extraneous sources.

We find no merit in the claims of error predicated on the evidentiary use of the defendant's statements. We are also in accord with the trial judge that, although a posttrial *Fidler* hearing (FN1) indicates one juror knew *before* voting to convict that the defendant had a prior criminal record, in light of overwhelming evidence of the defendant's guilt, the extraneous information did not prejudice the defendant so as to require a new trial. We therefore affirm the judgment and the denial of the motion for a new trial. We also conclude that there is no reason to exercise our power under G.L. c. 278, § 33E, in favor of the defendant.

We summarize the evidence at trial. The victim, a cousin of the defendant, was brutally murdered in her fourth-floor apartment at 45 School Street in Springfield sometime during the evening of January 5, 1982. The victim's boyfriend, Harrison Grant, saw her at her apartment that evening at about 6:30 P.M. According to Grant, he left at 8:45 P.M., at which time the victim was in her night clothes.

After visiting his sister and then a friend, Grant returned to the victim's apartment building at 11:30 P.M. He rang her apartment, using the buzzer at the security door, but received no response. Although Grant did not have a key to the victim's apartment, he was able to unlock the security door with the key to his apartment. As Grant approached the victim's fourth-floor apartment, he heard her television set playing at a loud volume. Grant's repeated knocks failed to bring

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

her to the door.

[392 Mass. 30] After unsuccessfully attempting to convince the apartment complex janitor, who lived at 47 School Street, to unlock the door to the victim's apartment, Grant returned to that door and opened it by breaking a glass panel with his hand and reaching inside to turn the knob. Stepping inside, he saw the victim lying on her couch in a partially naked and bloody state. Grant went back to inform the janitor. Alerted by Grant's shouts and hysterical behavior, the janitor called the police, who arrived to find the victim, and Grant, bleeding from his left arm, (FN2) yelling, "[T]hey killed her, they killed her." The victim's neck was slashed and her body had suffered multiple stab wounds to the chest, abdomen, and groin. There were strips of sheeting around her neck and ligature marks on her wrist. In addition to blood, water was found on the bed and in the vicinity of the body. An autopsy revealed sperm in the victim's vagina and rectum. (FN3)

Several items from the victim's apartment were removed by police and later introduced in evidence at trial. (FN4) A thorough search of the apartment failed to produce the victim's wallet. The rear door to the apartment was found unlocked. There were no signs of forced entry.

That evening, the defendant, who was living with one Linda Anderson in the apartment of Anderson's former father-in-law, (FN5) became involved in an argument with *1198 Anderson, which culminated in their tearing each other's clothes. The genesis of the dispute was the defendant's unemployed status and [392 Mass. 31] Anderson's consequent burden of supporting them on the money she earned at her job. Anderson shouted at the defendant to "get off his lazy butt ... and get a job." After the fight, Anderson went across the street to visit a friend. At 11:30 P.M., the defendant knocked on the door of the apartment of Anderson's friend, and told the friend that if she saw Anderson, she should tell her to come home, that the defendant had something important to tell her (Anderson).

When Anderson returned to the apartment at midnight, the defendant was there. The defendant told her he had gone for a walk to the Springfield Civic Center, where he sat on the steps. The defendant showed her two twenty dollar bills, and told her he found the money at the Civic Center folded in a discarded cigarette box. The defendant offered her the money for use in paying his rent. He suggested that they leave Springfield for Florida or California, and

said, "we [have] to get out of here." The defendant also stated they should "find another apartment where nobody will know where we're living." Shortly thereafter, the defendant and Anderson moved to another apartment.

On January 16, 1982, the defendant and Anderson went to the Springfield police station at the request of the police, who were questioning everyone who knew or was related to the victim. Before they arrived at the station, the defendant told Anderson not to mention to the police his discovery of the forty dollars on January 5 because the police might think he had robbed the victim. (FN6)

At the station, in response to a question about his whereabouts on the evening of January 5, the defendant stated that, after Anderson left their apartment, he departed at 9:30 P.M. to visit a former girlfriend, Jerri Wills, who lived at 73 School Street. He said he spoke to Wills, who was wearing a reddish robe and a faded green nightgown, through the door to her [392 Mass. 32] apartment, but that she didn't let him in the apartment because she was busy with another visitor. According to the defendant, he then returned to his apartment, arriving at 10:15 P.M. The defendant said he had not gone to the victim's apartment on January 5, and that, although he had visited the victim at her former apartment, he had never visited her at 45 School Street. The defendant asserted that he knew the victim lived in the School Street area, but did not know where her apartment was located.

The defendant and Anderson left the station. They returned on January 18 for further questioning. The defendant repeated his January 16 version of his actions on the night of the murder. At one point, the defendant was separated from Anderson, given *Miranda* warnings, and told that it was important he tell the truth about whether he had been at 45 School Street that night, because the police were checking fingerprints. The defendant again denied having gone to the victim's apartment. At the station, both Anderson and the defendant signed forms consenting to a search of their apartment. The police also obtained the defendant's fingerprints. When the defendant and Anderson left the station, he asked her whether she had told the police about the money he found on January 5. Anderson informed the defendant that she had told the police.

At the apartment, in the defendant's absence, Anderson gave the police the clothes he had worn on January 5, including one sock. When the defendant returned and found out what the police had taken away,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

he searched for the other sock, telling Anderson he wanted to see if there was blood on it. The defendant found the sock, and Anderson observed a red stain on it.

*1199 At trial, forensic experts stated that the shirt, jacket, pants, and sock worn by the defendant on January 5 had human blood on them, that a sample of human hair found in the victim's apartment was similar to the defendant's hair, that a sample of dog hair found in the apartment resembled hair the police had removed from the dog that lived in the defendant's former apartment, that fibers detected on the sweater worn by the defendant on the night of the murder matched the fibers of the [392 Mass. 33] victim's robe, and that a palm print discovered on the bloody section of the broom handle found in the victim's apartment was identical to the defendant's palm print. In addition, Jerri Wills contradicted the defendant's assertion that he had visited and spoken to her on January 5, and stated that she did not own a robe or nightgown resembling the clothes the defendant claimed he saw her wearing that night.

After the Commonwealth had rested, the defendant took the stand, admitted that he had been in the victim's apartment on the night she was killed, but denied committing the crime. The defendant stated that, at the end of his argument with Anderson, she suggested he visit his friends that night. After Anderson departed, he went to a package store and bought a can of beer. When he emerged from the package store, he stood on the sidewalk, glanced down, and spotted a money clip lying on the ground. He picked up the clip, pocketed the two twenty-dollar and one ten-dollar bills it contained, discarded the clip, went back into the package store, and bought a bottle of wine.

According to the defendant, he then went to visit a friend named Mumby, but found out she no longer lived at that address. The defendant insisted he then visited Jerri Wills, and that Wills told him she was busy with a boyfriend. The defendant said he asked Wills where his cousin lived, and Wills gave him general directions.

When the defendant, who is illiterate, arrived at the victim's building, he was unable to discern in which apartment she lived. The defendant said he went around to the back stairway, where he encountered a couple of residents who pointed out the victim's apartment. As he was walking up the stairs to the apartment, a man came running down and nearly knocked him over. The defendant found the back door to the victim's apartment open and walked in. He saw

the victim's blood-covered body, and was so startled he dropped the wine bottle he was still carrying, which broke on the floor.

The defendant said he thought of calling the police, but decided not to because he didn't want to be blamed for the murder. For the same reason, he subsequently withheld from the police the fact that he had been in the victim's apartment. [392 Mass. 34] Before leaving the apartment, he decided to clear up the mess created by the wine bottle because it was the only thing he had brought into the apartment. He used the broom to brush the glass into a plastic bag which he subsequently discarded in a dumpster. He also wiped the floor with a clean cloth he found in the victim's bathroom. He left the apartment, went to the Civic Center, sat on the steps, and then returned to his apartment.     -

Asked on cross-examination why he had told Anderson that he found the money in a cigarette box at the Civic Center rather than in a money clip in front of the package store, the defendant stated that forty dollars belonging to Anderson's former father-in-law had disappeared from the apartment they were living in, that the former father-in-law suspected the defendant, and that he (the defendant) thought that his discovery of the forty dollars would exacerbate the former father-in-law's suspicions.

1. *Statements to police.* The defendant claims his statement to police on January 18, that he had never been to the victim's 45 School Street apartment, was obtained in violation of his Fifth Amendment privilege, and that its use in evidence requires a new trial. (FN7) . We do not agree.

*1200 After holding a hearing, the judge found that when the defendant and Anderson came to the police station on January 16, 1982, the murder investigation had not focused on any one suspect. The defendant and Anderson arrived between 5 P.M. and 6 P.M. and were together at all times during the interview. Neither the defendant nor Anderson was under arrest, and both departed the station after the questioning, which lasted four to five hours. No *Miranda* warnings were given, nor was the [392 Mass. 35] defendant, who indicated to the police he wanted to assist in the murder investigation, subjected to any pressure. Notwithstanding his illiteracy, the defendant was alert, responsive, and articulate. He stated on three or four occasions that he had never been to the 45 School Street apartment.

On January 18, at the request of the police, the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

465 N.E.2d 1195, 392 Mass. 28, Com. v. Hunt, (Mass. 1984)                                     Page 6

defendant and Anderson returned to the police station for further joint questioning. They were not placed under arrest (FN8) and again departed after a four to five hour questioning session. At one point, the defendant was taken to a separate room, given *Miranda* warnings, told that the police were examining fingerprints taken in the victim's apartment, and asked if he had ever been in the 45 School Street apartment. The defendant reiterated that he had never been in that apartment.

The judge concluded that the defendant was not in custody at any time during the January 16 or January 18 interrogations, and that, even if the separate interrogation of the defendant on January 18 qualified as custodial, the defendant was advised of his *Miranda* rights and validly waived those rights.

[1] On appeal, the defendant contests only the judge's conclusion that he validly waived his privilege against self-incrimination during the separate interrogation on January 18. We conclude that the record amply supports the judge's determination that the defendant was not in custody during the interrogations on January 16 and January 18, particularly in light of the defendant's own testimony that he was comfortable during the questioning and was not in any way frightened, threatened, or pressured. See *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Commonwealth v. Bryant,* 390 Mass. 729, 736-741, 459 N.E.2d 792 (1984); *Commonwealth v. Best,* 381 Mass. 472, 493-494, 411 N.E.2d 442 (1980).

[2] We need not decide whether the separate questioning on January 18 was custodial, for there is nothing in the record that would lead us to disturb the judge's finding that the defendant's waiver of his *Miranda* rights during that questioning was knowing and intelligent. Further, the statement elicited from the defendant in that setting was wholly corroborative of his previous, lawfully obtained statement.

[392 Mass. 36] [3] *2. Statements to Anderson.* The defendant argues reversal is required because Anderson, acting as an agent of the police, induced him to become intoxicated and discuss the victim's murder with her. The defendant did not object to Anderson's trial testimony concerning the conversation in question, (FN9) and we therefore consider the *1201 defendant's claim only for the purposes of determining whether the failure to exclude that testimony created a substantial risk of a miscarriage of justice.

On cross-examination by the defense, Anderson stated that, on January 18 or 19, 1982, she informed one of the officers who interviewed her that the defendant relaxes when he drinks. According to Anderson, the officer asked her to get the defendant drunk and induce him to talk about the murder. When she told the officer she had no money for liquor, he gave her a ten dollar bill. Anderson stated she used the money to purchase a bottle of whiskey, which she brought home. The defendant drank the whiskey and "relaxed." On redirect examination, the prosecutor elicited from Anderson that, after the defendant imbibed the liquor, he asked her what the police knew about the murder. Anderson also said that, when she asked the defendant if he had been at the victim's 45 School Street apartment, the defendant asserted he had not been there. The next day, Anderson told the police what the defendant had said.

[4] Because the defendant did not object to Anderson's version of her conversation with the defendant, we are bereft of any findings as to the credibility of her statement that she was furnished money by a police officer for the purpose of eliciting incriminating information from the defendant. If the officer's conduct was as alleged by Anderson, it clearly exceeded the bounds of proper investigation, and a conviction founded on [392 Mass. 37] statements elicited in the context suggested by Anderson would in all likelihood necessitate reversal. "[T]he police may not accomplish through private proxies what they cannot do directly. If the defendant had shown [that Anderson was] ... acting as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile ..., the statements would have to be suppressed for failure to give *Miranda* warnings." *Commonwealth v. Mahnke,* 368 Mass. 662, 677, 335 N.E.2d 660 (1975), cert. denied, 425 U.S. 959, 96 S.Ct. 1740, 48 L.Ed.2d 204 (1976).

[5][6] Assuming, for purposes of discussion only, the veracity of Anderson's allegation, the defendant is not, on these facts, entitled to a new trial, for we cannot say that the use of his statements to Anderson created a substantial risk of a miscarriage of justice. Given his prior assertions to the police that he had not been in the victim's apartment, the consciousness of guilt inferable from his denial to Anderson that he had been in the apartment was not prejudicial. Nor do we perceive any prejudice to the defendant in the disclosure to the jury that, after ten hours of questioning by police, he was interested in what the police knew about the crime. (FN10)

*3. Extraneous influences on jury verdict.* On the night of Friday, July 23, 1982, the date on which the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

465 N.E.2d 1195, 392 Mass. 28, Com. v. Hunt, (Mass. 1984)                              **Page 7**

jury returned the verdict against the defendant, the defendant's attorney received a telephone call from George Bozeman, one of the deliberating jurors, who stated his opinion that the jury had discussed improper matters before returning the verdict. Defense counsel advised Bozeman to report the matter to the trial judge, and on Monday, July 26, 1982, the judge, defense counsel, and the prosecutor received a note from Bozeman stating that [392 Mass. 38] "[s]everal fellow jurors spoke to the group as though they did not follow daily instructions," that "one person *1202 mentioned law enforcement views of the past and pending indictments against Hunt," that "another [juror] added knowledge of testimony carefully excluded at Hunt's trial," and that "two others recounted news they saw."

Following the guidelines set forth in *Commonwealth v. Fidler,* 377 Mass. 192, 200-201, 385 N.E.2d 513 (1979), the judge questioned Bozeman in the presence of the prosecutor and defense counsel on July 29, 1982. Bozeman said that immediately after the verdict was reached, but before the verdict was reported to the judge, (FN11) one juror stated he had previously worked in the sheriff's office, that he knew the defendant had a prior conviction in Bermuda, (FN12) and that the defendant had been or would be indicted for the death of someone at a hospital in the Springfield area who was killed in a manner resembling the victim's murder. (FN13) According to Bozeman, the juror also stated that Florida and Bermuda officials would search their records for evidence against the defendant following his conviction in this case. Bozeman further testified that, in the interim after the verdict was reached, a second juror said the defendant had made a statement to his girlfriend that had been excluded from evidence because the contents proved him to be a liar. (FN14) Bozeman also referred to comments by two other unidentified jurors in the same time period that suggested those jurors had disobeyed instructions to eschew media accounts of the trial.

[392 Mass. 39] On September 14, 1982, the judge individually questioned the other eleven deliberating jurors. Both jurors named by Bozeman denied making the statements attributed to them by Bozeman. However, one other juror recalled that another juror stated after the verdict had been reached that the defendant had a prior criminal record. All of the jurors said they had not been exposed to media coverage during the trial.

On the basis of the jurors' answers to the questions put to them during the two *Fidler* hearings, the judge issued thorough written findings and rulings on the

defendant's motion for a new trial. The judge found that the remarks brought to the court's attention by Bozeman, if made, were all made after the jury had arrived at its unanimous verdict and after the court officers had been so advised. The judge also found that, apart from the corroboration of Bozeman's allegation that the defendant's prior record was discussed after the verdict was reached, Bozeman's allegations derived no support from the testimony of the other jurors. Based on his observation of Bozeman and the other jurors, the judge concluded that Bozeman's uncorroborated allegations were not credible. The judge found, however, that the defendant's prior record was discussed after the verdict had been agreed on and while the jurors were waiting to report the verdict.

The judge ruled that, unless a juror's uncommunicated knowledge during deliberations of matters not in evidence constitutes an extraneous influence on a jury verdict, the defendant had failed to meet his burden of proving the existence of an extraneous influence. See *Commonwealth v. Fidler, supra* 377 Mass. at 201, 385 N.E.2d 513. The judge noted that the status of uncommunicated knowledge as an extraneous matter was an issue of first *1203 impression in this Commonwealth, (FN15) assumed that the defendant had succeeded[392 Mass. 40] in demonstrating an extraneous influence, but concluded that the Commonwealth had met its burden of "show[ing] beyond a reasonable doubt that [the defendant] was not prejudiced by the extraneous matter." *Id.*

[7] The record fully supports the judge's finding that no extraneous information was communicated among the jurors prior to their arrival at a unanimous verdict, and we do not understand the defendant to argue to the contrary. Thus, this is not a case where "specific facts not mentioned at trial concerning one of the parties or the matter in litigation were brought to the attention of the *deliberating* jury by a juror" (emphasis supplied). *Commonwealth v. Fidler, supra* 377 Mass. at 200, 385 N.E.2d 513. However, although no extraneous facts were communicated by a juror to the other deliberating jurors, the record is consistent with the judge's finding that one juror had knowledge of the defendant's prior record before voting to convict. (FN16) The question before us is whether that knowledge entitled the defendant to a new trial.

[8] In deciding whether a verdict may be impeached through juror testimony indicating that a deliberating juror possessed uncommunicated factual

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

knowledge not adduced at trial, we start with the proposition that "[l]itigants are entitled to a decision on the evidence at trial, governed by the rules of evidence." *Commonwealth v. Fidler, supra* 377 Mass. at 197, 385 N.E.2d 513. "[W]hile the jury may leaven its deliberations with its wisdom and experience, in doing so it must not bring extra *facts* into the jury room" (emphasis supplied). *United States v. McKinney,* 429 F.2d 1019, 1023 (5th Cir.), modified on rehearing, 434 F.2d 831 (1970), cert. denied, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). Competent evidence that one, rather than some or all jurors, had access to potentially prejudicial information unfiltered by the trial process may suffice to invalidate a verdict. A defendant is "entitled to be tried by 12, not 9 or even 10 [or 11] impartial [392 Mass. 41] and unprejudiced jurors." *Parker v. Gladden,* 385 U.S. 363, 366, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966).

In order to avoid harassment of jurors, prevent jury tampering, promote the finality of verdicts, and maintain confidence in such verdicts, we have, however, limited the extent to which juror testimony may be used to overturn a verdict. *Commonwealth v. Fidler, supra* 377 Mass. at 195, 385 N.E.2d 513. The balance we have struck permits consideration of juror testimony regarding "overt factors" affecting the verdict, but prohibits impeachment of verdicts through juror testimony concerning "matters resting in a juror's consciousness." *Id.* at 198, 385 N.E.2d 513. *Commonwealth v. Maltais,* 387 Mass. 79, 91, 438 N.E.2d 847 (1982). "[T]he line between overt factors and matters resting in a juror's consciousness is not easily drawn, and difficult cases will arise." *Commonwealth v. Fidler, supra* 377 Mass. at 198, 385 N.E.2d 513.

[9] This is such a difficult case, but we believe that a juror's independent knowledge **\*1204** of a defendant's criminal record, when established through the testimony of other jurors, (FN17) is an overt factor "by which the verdict's validity can be objectively assessed." *Id.,* quoting 3 J. Weinstein & M. Berger, Evidence par. 606[03], at 606-25 (1978). The defendant's claim for a new trial on the basis of a juror's exposure to extra-record information would merit attention if such exposure were demonstrated through evidence that the juror read newspaper articles or spoke with a person who communicated that information, see *Parker v. Gladden, supra;* we can think of no reason why a different result should be reached when the evidence is that the juror made statements that clearly establish such exposure. See *Commonwealth v. Fidler, supra* at 200, 385 N.E.2d 513. "There was no mention of [the defendant's

criminal record] in court, so ... the only possible[392 Mass. 42] source of this information was extraneous to the trial." *Id.* at 199-200, 385 N.E.2d 513.

[10][11][12][13] Concluding that the defendant met his burden of demonstrating a deliberating juror's exposure to extraneous matter, (FN18) we turn our attention to the question whether the defendant was prejudiced by one juror's awareness of his prior criminal record. In evaluating prejudice, the trial judge properly avoided "any evidence concerning the actual effect of the matter on the juror's decision," but rather focused "on the probable effect of the extraneous facts on a hypothetical average jur[or]." *Commonwealth v. Fidler, supra* 377 Mass. at 201, 385 N.E.2d 513.

[14][15] An evaluation of the prejudicial effect of extraneous information requires consideration of a "matrix of factors," *United States v. Howard,* 506 F.2d 865, 867 n. 1 (5th Cir.1975), including whether the information is so inherently damaging to the defendant's case that prejudice must be inferred. *Commonwealth v. Fidler, supra* 377 Mass. at 201 n. 8, 385 N.E.2d 513. We think the judge properly concluded that juror knowledge of a defendant's prior criminal record does not fall into the category of extraneous matter automatically requiring a new trial. *Murphy v. Florida,* 421 U.S. 794, 795, 95 S.Ct. 2031, 2034, 44 L.Ed.2d 589 (1975). Cf. *State v. Beier,* 263 N.W.2d 622 (Minn.1978) (defendant in rape trial not prejudiced by [392 Mass. 43] three jurors' knowledge that he was awaiting trial on charges relating to death of another girl). The judge was therefore free to consider the effect of the extraneous knowledge in light of the strength of the evidence against the defendant. *Commonwealth v. Fidler, supra. United States v. McKinney,* 434 F.2d 831, 832-833 (5th Cir.1970), cert. denied, **\*1205.** 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). *State v. Beier, supra.*

[16] We are in agreement with the judge that the evidence against the defendant was overwhelming. The defendant admitted at trial that he was in the victim's apartment during the evening she was killed and was shown to have blood and fibers from the victim's robe on his clothes. As we read the record, the inconsistencies and logical gaps in the defendant's explanations of his presence in the apartment and his activities that evening were sufficient to warrant the assumption of the judge, who observed the defendant, that the defendant's credibility to the average juror was destroyed irrespective of knowledge of prior convictions. We note in particular the defendant's inability to explain his conflicting versions of where he had obtained the money he acquired the night of the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

465 N.E.2d 1195, 392 Mass. 28, Com. v. Hunt, (Mass. 1984)                              **Page 9**

murder, and the defendant's insistence that he had visited Jerri Wills that night in the face of Wills' contradiction of that claim. There was no error in the judge's considering as evidence of the strength of the case against Hunt the fact that a unanimous verdict, including the votes of eleven jurors not shown to have been exposed to extraneous information, was reached within an hour of their retirement to the jury room. See *Commonwealth v. Doyle,* 392 Mass. 23, 465 N.E.2d 1192 (1984); *Commonwealth v. Webster,* 391 Mass. 271, 276 n. 2, 461 N.E.2d 1175 (1984). Finally, we observe that, given the defendant's claim that his repeated lying about his presence in the victim's apartment was prompted by fear that he would be blamed for the crime, the knowledge of one juror that the defendant had a prior criminal record does not necessarily detract from the credibility of the defense.

We conclude that there is no error in the judge's determination that the Commonwealth demonstrated beyond a reasonable doubt that the defendant was not prejudiced by the extraneous matter. *Commonwealth v. Fidler, supra* 377 Mass. at 201, 385 N.E.2d 513. There was no error in the denial of the motion for a new trial.

[392 Mass. 44] 4. *Review pursuant to G.L. c. 278, § 33E.* We have carefully reviewed the record before us to consider whether the defendant is entitled to a new trial or to the entry of a verdict of a lesser degree of guilt. We conclude there is no reason to exercise our power in favor of the defendant.

*Judgment affirmed.*

*Denial of motion for new trial affirmed.*

(FN1.) See *Commonwealth v. Fidler,* 377 Mass. 192, 385 N.E.2d 513 (1979).

(FN2.) In addition to breaking the glass panel in the victim's apartment door, Grant broke the glass panel on the security door to 47 School Street when, after finding the victim's body, he returned there to inform the janitor of his discovery.

(FN3.) The victim's boyfriend stated at trial that he had not engaged in sexual intercourse with her in the three weeks preceding the date of the murder.

(FN4.) These items included the victim's robe; a knife with blood and clothing fibers; a broom with a bloody handle; samples of human and dog hair; the victim's pocketbook, found on the floor with its contents strewn about; and a cigarette butt discovered in the toilet. There was evidence that

neither the victim nor her boyfriend smoked, but that the defendant did.

(FN5.) The apartment was also occupied by Anderson's ex-brother-in-law, and a dog, Tigger.

(FN6.) On January 6, 1982, the defendant and Anderson jointly heard a radio report of the victim's murder. Later that day, as they were walking along School Street, Anderson stopped in front of the victim's apartment building. The defendant appeared nervous and beckoned Anderson away.

(FN7.) The issue arises in a peculiar procedural posture. The defendant at no point filed a motion to suppress the statement in question. The Commonwealth, apparently out of excessive caution, requested a voir dire on the admissibility of the defendant's statement to the police. The defendant's counsel agreed to the voir dire but refused to file a motion to suppress. The judge treated the matter as a motion in limine by the Commonwealth, and, after hearing testimony from a lieutenant who interviewed the defendant and from the defendant, issued written findings and ruled the statement admissible. Defense counsel objected to the ruling, and pursues the issue on appeal.

(FN8.) The defendant was not arrested until January 21, 1982.

*1205_    (FN9.) The defendant objected to the admissibility of another statement he made to Anderson while incarcerated following his arrest. The sole basis for that objection was a claim that the police obtained the statement, preserved in writing by Anderson, through an abuse of the subpoena power. Although the defendant did not argue that Anderson was acting as a police agent, the judge, in ruling that there was no abuse of the subpoena power and that the statement was admissible, found that Anderson was not acting as a police agent. Notwithstanding the judge's ruling in its favor, the Commonwealth elected not to introduce the written statement in evidence.

(FN10.) The defendant also argues the police acted improperly in telling Anderson, the mother of two children who were living with their grandparents in Connecticut, that if she cooperated with the police, the police would assist her in efforts to bring the children to Massachusetts to live with her. Anderson stated on redirect that her discussions with the police concerning her children did not

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

465 N.E.2d 1195, 392 Mass. 28, Com. v. Hunt, (Mass. 1984)                                            **Page 10**

influence her decision to cooperate in the investigation. In any event, the arrangement between Anderson and the police goes to the credibility of her statements, not to their admissibility. Further, as we have detailed in the text, the defendant has established no prejudice from Anderson's testimony concerning the conversation in question.

(FN11.) The verdict against the defendant was reached approximately fifteen minutes before it was reported to the court. It took fifteen minutes to assemble the attorneys and prepare the court room for the jury.

(FN12.) The prosecutor represented in a lobby conference that the defendant, who lived in Bermuda prior to coming to the United States, had a prior Bermudian conviction for rape, but the prosecutor elected not to use the defendant's prior convictions to impeach.

(FN13.) The prosecutor indicated in the lobby conference that the defendant had been indicted for the murder of another woman who died from multiple stab wounds.

(FN14.) A pretrial statement by the defendant to Anderson that paralleled his trial testimony was ruled admissible by the judge but not placed in evidence. See note 9 *supra.*

(FN15.) The only case from another jurisdiction treating the question before us is *United States v. Eagle,* 539 F.2d 1166 (8th Cir.1976), cert. denied, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977) (defendant not entitled to new trial or to interrogation of juror who submitted affidavit that he had realized during trial defendant was implicated in another shooting; defendant "alleged no overt acts susceptible to the other jurors' knowledge," *id.* at 1170). In the *Eagle* case that defendant attempted to impeach the verdict with a juror's uncorroborated testimony concerning the juror's own uncommunicated knowledge. See note 16 *infra.* See also *United States v. Blair,* 444 F.Supp. 1273, 1275 n. 2 (D.D.C.1978).

(FN16.) We accept the judge's finding, based on his weighing of the relative credibility of the jurors, that, apart from one juror's statement indicating that

juror's awareness of the defendant's prior record, none of the statements alluded to by Bozeman were made. We therefore consider the defendant's claim of prejudice on the premise that one, and only one, juror had pre-verdict knowledge of facts about the defendant which were not in evidence.

(FN17.) We need not decide whether a juror's uncorroborated posttrial testimony concerning his or her uncommunicated pre-verdict knowledge may be considered on a motion for a new trial. See *United States v. Eagle,* 539 F.2d 1166 (8th Cir.1976). We are of the opinion, however, that permitting jurors to "remain silent during deliberations and later assert that they were influenced by improper considerations," *id.* at 1170, "would add unduly to the already fragile state of criminal convictions." *United States ex rel. Owen v. McMann,* 435 F.2d 813, 817 (2d Cir.1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971).

(FN18.) We note that, as a general matter, the pre-empanelment voir dire of prospective jurors, rather than a postverdict *Fidler* hearing, is the appropriate forum for investigating extraneous knowledge brought to the case by a juror. See *Commonwealth v. Fidler,* 6 Mass.App. 28, 40, 371 N.E.2d 1381 (1978), aff'd, 377 Mass. 192, 385 N.E.2d 513 (1979). All of the jurors answered in the negative when asked during the empanelment proceeding whether they knew or had read or heard anything about the case. The jurors were not specifically asked if they knew the defendant. Rather, they were asked if they knew anything about the case. Thus, the record does not indicate a deliberate choice by the juror not to disclose his knowledge of the defendant's prior record. We think, however, that, in light of the juror's nondisclosure of his knowledge of the defendant's prior record, the defendant cannot be deemed to have waived his claim for a new trial based on the juror's undisclosed pre-empanelment information. See generally *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 847 n. 2, 78 L.Ed.2d 663 (1984). We observe that, even if the juror withheld the information, a new trial is not required unless the defendant was prejudiced thereby. Compare *United States v. Vargas,* 606 F.2d 341 (1st Cir.1979), with *United States v. Eubanks,* 591 F.2d 513 (9th Cir.1979).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.